# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**BONNIE LYNCH,**

                  **Plaintiff,**

        -vs-                                          Case No. 05-C-508

**JO ANNE B. BARNHART,**
**Commissioner of Social**
**Security Administration,**

                  **Defendant.**

## DECISION AND ORDER

This matter comes before the Court on Bonnie Lynch's ("Lynch") appeal of an order denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 405(g), 1381. Plaintiff alleged total disability due to growths on, and constant pain in, both feet, constant back pain, right shoulder pain and carpal tunnel syndrome in her right arm. Plaintiff also alleged disability based on affective mental impairments.

After denying Lynch's applications initially and upon reconsideration, the Appeals Council vacated and remanded to an administrative law judge for further proceedings. On September 15, 2003, ALJ Margaret O'Grady held a supplemental hearing during which plaintiff, represented by counsel, testified, as well as a vocational expert. The ALJ found that plaintiff retained the residual functional capacity ("RFC") to perform simple, unskilled, routine work at the light exertional level, which required no overhead reaching, only occasional vertical reaching and only occasional postural movements. Tr. 25. The ALJ also found that there were a

significant number of jobs plaintiff could perform and therefore she was not disabled or entitled to benefits. The Appeals Council denied review. Tr. 8-10.

For the reasons that follow, the Commissioner's decision is affirmed.

## BACKGROUND

Plaintiff was born on December 16, 1951. Tr. 532. She took special education classes and graduated from high school in June 1972. Tr. 72, 77. Her work history consists of simple, unskilled jobs. Tr. 77, 82, 93. At the time of her application, plaintiff was employed part-time selling Avon products. Tr. 85, 88. At the time of the hearing,[1] plaintiff was working part-time at the Roxie Supper Club, bussing the dining room, setting tables, and doing light cleaning. Tr. 534. Plaintiff alleged total disability due to growths on, and constant pain in both feet, constant back pain, right shoulder pain and carpal tunnel syndrome in her right arm. Tr. 539-541.

### I.    Medical Evidence

Medical records from 1994 indicate plaintiff was functioning in the borderline range of intelligence and that she had a history of growths on her feet. Tr. 190-94, 197, 354-57. Between 1995 and 2000, plaintiff was treated for her foot problems with orthotics. Tr. 190-193, 352-357.

In August 1997, plaintiff strained her arm and neck scrubbing walls at work. Tr. 182. She received physical therapy with chiropractic treatment from Belville Fletcher Chiropractic in 1997 and 1998. Tr. 209-15, 276-89. Dr. Belville released plaintiff to return to work in October 1997, opining that she could perform medium exertion work that did not require repetitive use of her right arm or overhead activity. Tr. 180.

---

[1] Unless otherwise noted, all references to "the hearing" are to the second hearing before ALJ O'Grady, which took place on September 15, 2003. Tr. 527-78.

-2-

Orthopedic surgeon Kenneth Lay, M.D., examined plaintiff on November 21, 1997. Tr. 182-89. Plaintiff demonstrated diminished range of motion in her neck without pain and reduced motion in her shoulder. Tr. 185. Dr. Lay noted that plaintiff could fully move her shoulder with "more definitive effort," Tr. 185, that there were "no truly objective signs of injury," and that plaintiff did not have any functional limitations. Tr. 187-88.

On March 22, 2000, plaintiff saw Dr. Belville with a sudden onset of back pain. Tr. 274. She alleged that her pain was at a level ten on a scale of one to ten. Tr. 274. On March 24, 2000, plaintiff told Dr. Belville that her back and neck pain were "much improved." She requested a work restriction note she could present to prospective employers. Dr. Belville gave her a note indicating that she could perform light-medium exertion work four to six hours per day, twenty hours per week. Tr. 271, 274.

On April 4, 2000, plaintiff contacted Mark Smith, who had treated her foot condition, and asked him to provide a letter in support of her application for disability benefits stating that she could not work because of her foot condition. Tr. 309. Dr. Smith informed plaintiff that he never said her foot condition would prevent her from working and that he would need to examine her before he could render an opinion about her work-related limitations. *Id.*

On May 2, 2000, plaintiff informed nurse practitioner Jill Collier that she still had low back pain and problems with her shoulder. Tr. 312. A May 9, 2000 MRI showed narrowing in plaintiff's right shoulder joint, with normal soft tissue and normal bony structures. Tr. 262. A May 9, 2000 examination revealed mildly reduced range of motion in plaintiff's neck, no tenderness, good range of shoulder motion, and normal reflexes strength and straight-leg raising. Tr. 260.

On May 30, 2000, Dr. Leveille noted that plaintiff continuously moved her shoulder posteriorly to pop it "in a tic-like fashion." He observed that the popping was self-induced and

that plaintiff's shoulder did not pop if she kept her AC joint low when moving her arm. Range of motion in plaintiff's shoulder was otherwise complete and straight-leg raising was negative. Tr. 259.

July 2000 x-rays and a bone scan of plaintiff's right shoulder were normal. Tr. 304-05. On July 24, 2000, a state agency physician reviewed the record and opined that plaintiff retained the functional capacity to lift fifty pounds occasionally and twenty-five pounds frequently, and that she could sit or stand and walk for six hours each during an eight-hour day. Tr. 225-31.

Plaintiff saw Bashab Banerji, M.D., twice in July 2000 for assessment of her shoulder condition. Tr. 301-02. She complained of pain at a level ten on a scale of one to ten, but Dr. Banerji noted that she was in no apparent distress upon examination. *Id.* He sent her for a complete shoulder work-up, and noted on August 15, 2000 that the MRI had apparently shown a rotator cuff tear. Tr. 300.

A treatment note dated August 23, 2000 indicates that plaintiff was stable emotionally and doing well on medication. Tr. 257. She was apparently scheduled to undergo rotator cuff surgery. On August 24, 2000, however, Davis Tsai, M.D., noted that it was a misunderstanding and that it was another patient, not plaintiff, who had a torn rotator cuff. Tr. 264. According to Dr. Tsai, plaintiff's scapula imaging was normal and he did not suspect a tear. Tr. 268. Plaintiff had full range of motion in her shoulder without discomfort, with some grating of her scapula. Tr. 268. Dr. Tsai opined that plaintiff would be best-suited to "light filing or deskwork," and that she could not perform any manual labor jobs. Tr. 265.

Plaintiff continued treatment with Nurse Collier. In an undated, unsigned functional capacity form, Nurse Collier opined that plaintiff could lift less than twenty-five pounds, did not have any limitations of her ability to sit, stand or walk and had moderately restricted abilities to stoop, twist, crouch and crawl. Tr. 317-18, 380-81. In February and March 2001, plaintiff told

Nurse Collier that she was feeling good and not having any problems with her back. Tr. 385. Nurse Collier noted that plaintiff's back pain was "resolved." *Id.* On February 22, 2001, plaintiff advised Nurse Collier that her shoulder was not a problem if she was not using it. Nurse Collier advised her to return to work in a week and work at her own pace. *Id.* In March, plaintiff's primary complaint was reduced strength in her right arm. Tr. 384. She was on medication for depression and was not sure whether it had started working yet. *Id.*

On February 20, 2001, plaintiff began mental health treatment with Winnebago County Clinical Services. Plaintiff underwent a psychological evaluation on March 1, 2001 with case manager Judie Robson. Tr. 360-61. Plaintiff reported progressive depression, fatigue, low motivation and poor sleep, but she also reported that she was able to meet the requirements of daily living. Robson, supervised by Michael Daehn, Ph.D., opined that the severity of plaintiff's symptoms were not enough to merit a diagnosis of major depression. She recommended weekly therapy. Tr. 361.

A second state agency physician reviewed plaintiff's medical records in March 2001, who opined that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and sit or stand and walk for six hours each in an eight-hour workday. Tr. 324-30. A second state agency psychologist also reviewed plaintiff's medical records in March 2001. Tr. 331-48. He opined that plaintiff was not significantly limited in most areas of mental functioning. He also opined that she had a moderately limited ability to: understand and remember detailed instructions; maintain attention or concentration for extended time periods; perform activities within a schedule and maintain regular attendance; and complete a normal workday without interruptions from psychologically based symptoms. Tr. 346-47.

Plaintiff began individual therapy with Ms. Robson on March 8, 2001. She had a good affect with "lots of smiles" and Ms. Robson noted that her depression appeared to be lessened.

Tr. 363. Therapy notes from March and April 2001 reveal that plaintiff was less depressed and taking time to do things to elevate her mood. Tr. 364. Plaintiff maintained good eye contact during the session and "laughed and smiled frequently." Tr. 364. On April 11, 2001, Ms. Robson observed that there was no longer any evident depression. Tr. 365. On May 9, 2001, plaintiff and her husband reported that her mood had "improved substantially," and plaintiff smiled and laughed often during the session. Tr. 367. Therapy notes from June 2001 through November 2001 reveal that plaintiff continued to do well, reported better sleep and no episodes of sadness or crying and often smiled and laughed during her sessions. Tr. 368-75. Ms. Robson opined in June 2001 that plaintiff's depression was in remission. Tr. 368. Plaintiff reported no side effects from her medication. Tr. 368-75. On November 15, 2001, plaintiff was late for her session because she had been running errands "all morning," and she noted that she had more errands to do in the afternoon. Tr. 374. She was in a good mood, despite having been recently laid off from work, and she was smiling and neatly dressed. Tr. 374. Plaintiff further reported no difficulty with sleep and that she had motivation to complete "all house chores." Tr. 374.

On January 14, 2002, Nurse Collier wrote a community service restriction note, in which she opined that plaintiff could not bend or twist at the waist or lift more than five pounds, and that she was released to perform sitting work. Tr. 379.

On March 26, 2002, plaintiff told Dr. Daehn that she had not been sleeping well recently, although she did not report feeling generally depressed. Tr. 396. Plaintiff stated that she came to see the therapist at the request of her husband, who was worried that she was not sleeping well. Dr. Daehn noted that plaintiff did not describe any clinically significant distress or impairment in her life functioning. Tr. 396. On April 3, 2002, plaintiff reported "vague complaints" about feeling tired, but she was in an "upbeat mood" during the examination. Tr.

393. Dr. Daehn reported that he could not elicit anything to suggest that plaintiff was experiencing significant levels of emotional distress. Tr. 393.

On May 31, 2002, plaintiff underwent an examination with A. Neil Johnson, M.D.. Tr. 418-20. She reported discomfort in her neck, back, right shoulder and feet. Tr. 418. Plaintiff exhibited some discomfort with motion of her back and right shoulder and had mild difficulty getting on and off the examination table, walking on heels and toes and squatting. Tr. 419. Straight leg raising was negative and there was no muscle spasm in plaintiff's low back. Tr. 419. Plaintiff also exhibited full use of her hands. Range of motion was slightly decreased in plaintiff's low back, but shoulder range of motion and strength were normal. Tr. 419-20. Dr. Johnson opined that plaintiff could lift twenty pounds occasionally and ten pounds frequently and stand for six hours per day, one hour at a time. Tr. 422. He found no limitation in her ability to sit and limited her to occasional climbing, stooping and crouching. Tr. 422-23. Dr. Johnson also opined that plaintiff should avoid heights and that reaching with her right arm would be limited by shoulder pain. Tr. 423.

## II.    Plaintiff's Testimony

At the hearing, plaintiff testified that she was currently working at a supper club doing light cleaning for 20 hours per week at $7.00 per hour. If she could not do some part of the job, she just did not do it. Before that she was a mail opener, but was laid off after two months in October 2001 because there was less mail and because she could not do other jobs. Tr. 534. She also had done some dining room work, but quit because it was hard on her feet and she was too tired. Tr. 535. Plaintiff described that she had foot pain in both feet, mostly when she walks or stands. She stated she also has pain in her back every day unless she is lying down and the pressure lets up. Plaintiff testified that she has pain in her right shoulder which hurts all the time when it is popping and grinding. Tr. 538-40. She stated it pops and grinds about 50 times a day,

not depending on what she is doing. She also has pain in her right hand where she has carpal tunnel. Tr. 541. Plaintiff stated that she was taking Prozac for depression, Niacin, Faldyne for arthritis in her back and USP powder for high cholesterol. Tr. 542. She also takes Tylenol three to four times a day. She did not have any side effects from these medications. Tr. 543.

At her current job, plaintiff washes tables, makes sure everything on the table is clean, and might climb on her hands and knees to wash or dust chairs. She can sit or stand at her job as she chooses. Tr. 548. Each day after work, she goes home and naps for 2-3 hours and then goes to bed early. Tr. 549. Her pain increases if she sits or stands too long or walks too far. Tr. 552. Plaintiff opined that she could sit/stand/walk about 15 minutes before the pain increases. She walks about 5 blocks to work, and can sit down once she gets to work. Tr. 553-54. She is able to maintain her hygiene, including showering and her hair, even if she has to use one hand. Tr. 557-58. She explained that her husband has to go grocery shopping with her, because she cannot lift the groceries. Tr. 557.

### III.     Husband's Testimony

Plaintiff's husband, Mr. Lynch, also testified at the hearing. He stated that he helped her get the job at the Roxie but believed she was not able to do the job. He stated plaintiff had problems lifting, couldn't carry a lot of things, and drops dishes when her arm goes out. Tr. 559. He noted that when she gets a stack of dishes, she'll drop a couple of them. Tr. 560. To him, plaintiff looks fatigued all the time. She goes to bed at 8:00 p.m. and gets up at 6:00 a.m., but sometimes when she is really tired she will just stay in bed from the time she gets home from work. Tr. 563.

### IV.     Vocational Testimony

Vocational expert ("VE") Jerrold Odress testified at the hearing. The ALJ asked the VE to identify jobs that could be performed by an individual with plaintiff's age, education and work

experience who was limited to simple, unskilled, routine repetitive jobs at the medium level of exertion, who could only occasionally perform postural movements. Tr. 569. The VE identified thousands of medium exertion jobs and more than 58,000 light exertion jobs in the State of Wisconsin that such an individual could perform. Tr. 570. The VE testified that most of the identified jobs could be performed by an individual who could not reach overhead. Tr. 570. The VE further testified that, if the individual needed to alternate between sitting and standing as needed, approximately 14,000 cleaning, maid and packaging jobs would be eliminated from consideration, but that there would still be at least 21,000 light exertion jobs that such an individual could perform. Tr. 570-71.

## DISCUSSION

### I. Standard of Review

Section 205(g) of the Social Security Act limits the scope of judicial review of the Commissioner's final determination, and provides that the findings of the Commissioner as to any fact shall be conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000). A court may reverse the Commissioner when the ALJ's decision is not supported by substantial evidence or is based on legal error. *Eads v. Secretary of Dep't of Health and Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993).

### II. Analysis

The ALJ followed the familiar five-step process for evaluating disability claims. She found at step five that plaintiff was not disabled because she could work a significant number of jobs in the national economy. 20 C.F.R. § 404.1572. Plaintiff argues that this matter should be reversed and remanded for another hearing because (1) the ALJ did not assess plaintiff's

credibility pursuant to SSR 96-7p, (2) the ALJ did not comply with the requirements of SSR 96-8p regarding plaintiff's Residual Functional Capacity nor with SSR 96-2p regarding the opinions of plaintiff's treating sources, and (3) the ALJ failed to provide a complete hypothetical to the vocational witness.

### A. Credibility Assessment

The ALJ found that "[w]hile claimant may have some degree of pain and limitation, it is not as severe or limiting as she has alleged with clear elements of overstatement." Tr. 25. Plaintiff argues that this is insufficient because the ALJ must make more than a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). Furthermore, plaintiff argues that the ALJ did not comply with SSR 96-7p because he did not consider all of the seven factors listed therein to be used when assessing the credibility of plaintiff's statements regarding symptoms. *See* SSR 96-7p, 1996 WL 374186, *3 (S.S.A.) (*e.g.*, the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms).

However, the ALJ is not required to discuss each and every credibility factor, and an ALJ's credibility determination will not be disturbed unless it is "patently wrong," *i.e.*, unless it is not supported by substantial evidence. *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003) (omissions in the ALJ's credibility finding does not establish that the finding is not supported by substantial evidence). Because "hearing officers are in the best position to see and hear the witnesses and assess their forthrightness," courts "afford their credibility determinations special deference." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Furthermore, plaintiff's argument short-changes the ALJ's analysis of her credibility at the hearing. For example, the ALJ wrote: "Having reviewed the medical evidence *and testimony*, the undersigned

is inclined to concur with the Disability Determination Services and Administrative Law Judge Garwal regarding claimant's residual functional capacity. . . . Claimant has offered a multiplicity of musculoskeletal aches and pains involving the back, neck and shoulders in particular, *yet physical examination results have failed to reveal any significant abnormalities here*." Tr. 24 (emphasis added).[2] This statement, in conjunction with the ALJ's conclusion that plaintiff's allegations were "overstatement," is a clear indication that the ALJ found the objective medical evidence more credible than plaintiff's testimony. This determination is supported by substantial evidence and is sufficient as a matter of law.

### B. Objections to RFC Findings

Plaintiff offers a series of challenges to the ALJ's RFC findings. Pl.'s Br. at 17-24. None of these alleged errors are sufficient to overturn the ALJ's RFC finding, which was based on substantial evidence in the record. The opinions of Dr. Lay, Tr. 187-88, Dr. Smith, Tr. 309, Dr. Leveille, Tr. 259, Dr. Banerji, Tr. 301-02, Dr. Tsai, Tr. 264-65, Nurse Collier, Tr. 317-18, 385, as well as the reviewing state agency physicians, Tr. 225-31, 324-30, all support the ALJ's RFC finding and conclusion that plaintiff was not disabled. While other evidence in the record may support the opposite conclusion, the Court's function is not to re-weigh that evidence. *See Powers*, 207 F.3d at 434-35 (court may not decide facts anew, re-weigh the evidence or substitute its own judgment for that of the Commissioner).[3]

Plaintiff also argues that the ALJ ignored substantial evidence in the record regarding her mental impairments. However, there is also substantial evidence in the record to support the ALJ's conclusion that plaintiff did not have a significantly limiting affective disorder. *See, e.g.*,

---

[2] The ALJ goes on to consider and reject the evidence regarding the calluses on plaintiff's feet, allegations regarding mild carpal tunnel syndrome, a cyst on plaintiff's left index finger, and plaintiff's affective disorder. Tr. 24.

[3] The ALJ failed to articulate her reasons for rejecting the opinion of Dr. Belville. However, remand is unnecessary in this regard because Dr. Belville is a chiropractor, which is not an "acceptable medical source" pursuant to the regulations. *See* 20 C.F.R. § 404.1513. Furthermore, Dr. Belville's opinion is inconsistent with other substantial evidence in the record.

Tr. 393, 396 (nothing to suggest plaintiff was experiencing significant levels of emotional distress); Tr. 365 (after only one month of therapy, there was no longer any depression evident); Tr. 368 (depression in remission). Once again, the Court will not disturb the ALJ's ruling in this regard. "The ALJ need not address every single piece of evidence in his decision." *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004).

### C. Hypothetical Questions to Vocational Expert

Plaintiff argues that the ALJ failed to incorporate any mental limitations into her hypothetical questioning. However, the ALJ asked the VE to identify only simple, unskilled, routine jobs, which would account for plaintiff's low IQ. Plaintiff further argues that the ALJ erred because she did not include the opinion of one of the reviewing state agency physicians, reflected in a Psychiatric Review Technique Form (PRTF), that plaintiff would "often" experience deficiencies in concentration, persistence and pace. Tr. 239. Plaintiff cites *Kasarsky v. Barnhart*, 335 F.3d 539 (7th Cir. 2003), where similar limitations noted in a Psychiatric Review Technique Form (PRTF) ("frequent" deficiencies of concentration, persistence, or pace) were not properly incorporated into a hypothetical for the VE. *Kasarsky* is distinguishable because the PRTF in *Kasarsky* was filled-out by the ALJ and was therefore expressly adopted as a finding of the ALJ. In the instant case, the PRTF cited by the plaintiff was filled-out by a state agency physician, was not expressly adopted by the ALJ, and was contradicted by a subsequent PRTF. Tr. 346-47. As noted above, the ALJ's findings – that plaintiff's intelligence and affective disorders "would not prevent her from simple, routine, unskilled jobs including those identified by the vocational expert at the hearing" – were incorporated into the hypothetical posed to the VE. Tr. 24.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. The Commissioner's decision is **AFFIRMED**; and

2. This matter is **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 22nd day of September, 2006.

**SO ORDERED,**

s/ Rudolph T. Randa
**HON. RUDOLPH T. RANDA
Chief Judge**